<u>**NOT FOR PUBLICATION**</u>

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

IMPORTERS SERVICE CORPORATION,

              Plaintiff,

              v.

MARIO ALIOTTA, et al.,

              Defendants.

No. 22cv4640 (EP) (JBC)

**OPINION**

**PADIN, District Judge.**

Plaintiff Importers Service Corporation d/b/a ISC Gums ("ISC") brings this diversity[1] action against Mario Aliotta ("Aliotta") and two entities owned and/or controlled by Aliotta—RE International Import-Export Limited ("REI"), and Aliotta Holdings Limited ("Aliotta Holdings"). The action concerns the business relationship between ISC, Aliotta, and his companies, REI and Aliotta Holdings, with respect to ISC's purchases of raw gum from international suppliers through Aliotta and REI. *See generally* Third Amended Complaint, D.E. 53 ("TAC").

Defendants move to dismiss the TAC on two grounds: lack of personal jurisdiction over Aliotta and Aliotta Holdings pursuant to Federal Rule of Civil Procedure 12(b)(2); and failure to state a claim upon which relief can be granted pursuant to Rule 12(b)(6). *See* D.E. 54-11 ("Mot."). The Court decides the motion without oral argument. *See* Fed. R. Civ. P. 78(b); L.Civ.R.78(b).

---

[1] The Court is satisfied that diversity jurisdiction exists. Plaintiff is a New Jersey corporation, Defendant Mario Aliotta is an Italian citizen and resides in the United Kingdom, Defendants RE International Import-Export Limited and Aliotta Holdings Limited are UK entities. Additionally, the amount in controversy is over $75,000. *See* 28 U.S.C. § 1332.

For the reasons set forth below, Defendants' motion will be **GRANTED *in part*** and **DENIED *in part.***

I.      **BACKGROUND**[2]

     A.      **Parties**

Plaintiff ISC is a New Jersey-based corporation.  TAC ¶ 1.  Defendant Aliotta is an Italian national and resident of the United Kingdom.  *Id.* ¶ 2.  Defendant REI is a corporate entity organized under the laws of England and Wales.  *Id.* ¶ 3.  Aliotta is the sole director of REI.  *Id.* Defendant Aliotta Holdings is a company organized under the laws of England and Wales and is owned and controlled primarily by Aliotta.  *Id.* ¶ 4.

     B.      **Factual Background**

ISC imports consignments of raw gums[3] from suppliers, largely based in Africa, into the United States.  *Id.* ¶ 14.  The imported Gum Products are then processed in ISC's New Jersey plant and subsequently sold domestically or exported to its wholly owned subsidiary, ISC Europe Limited ("ISC Europe"), to be sold abroad.  *Id.* ¶¶ 23-25.[4]

However, instead of purchasing Gum Products directly from suppliers, ISC places orders through third-party intermediaries by telling them how much product ISC needs at any given time. *Id.* ¶ 15.  ISC does not have exclusivity agreements with, or obligations to accept offers from, any third-party intermediaries.  *Id.* ¶¶ 17-18.

---

[2] The facts in this section are taken from the well-pled factual allegations in the TAC, which the Court presumes to be true for purposes of resolving the motion to dismiss.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

[3] Specifically, Gum Acacia, Gum Arabic, Gum Karaya, and Gum Tragacanth (collectively, "Gum Products").

[4] In approximately May 2006, ISC hired Aliotta to serve as a director ISC Europe.  *Id.* ¶ 25.

For almost two decades, REI was a third-party intermediary for ISC. *Id.* ¶ 9. Through their repeated course of dealings, ISC and REI developed an "understanding" that the prices presented to ISC by REI from suppliers would include no more than $50 per metric ton as commissions to REI for facilitating the transaction. *Id.* ¶¶ 27-28. The standard commission in the industry for third-party intermediaries like REI ranged from $25 to $50 per metric ton. *Id.* ¶ 30. Aliotta repeatedly made oral and written communications to ISC stating that REI's prices reflected the suppliers' prices plus commissions of no more than $50/ton. *Id.* ¶¶ 28-29, Ex. C.[5]

Beginning in approximately April 2016, Aliotta and REI began misrepresenting suppliers' offers by inflating the suppliers' prices and keeping the difference as additional commissions. *Id.* ¶ 33. For example, on or about April 11, 2016, REI claimed that one of the suppliers was willing to sell 140 metric tons ("MT") of its gum product for no less than $1,210 per MT, with REI obtaining no more than $50 per MT in commission. *Id.* ¶ 34. However, the supplier was actually selling the gum product at $1,150 per MT and REI and Aliotta took $110 per MT for themselves in commissions. *Id.* ¶ 35. REI sent many purchase orders that misrepresented supplier prices and commissions. *Id.* ¶¶ 27-29, 34-303.

In approximately October 2019, a supplier contacted ISC about an unrelated issue. *See id.* ¶ 304. During conversations between that supplier and ISC, ISC learned that the supplier's offer prices to REI differed from the offer prices REI presented to ISC. *Id.* ¶ 305. To prevent ISC from discovering Aliotta's and REI's alleged fraud, REI required suppliers to sign agreements which provided, in relevant part, that any communications by the supplier with ISC, "at any time" and "in any circumstance" would breach the agreement. *Id.* ¶ 306, Ex. E.

---

[5] Exhibit C consists of a 2009 email from Aliotta to ISC stating, "[t]his price includes me but not 50 USD but 25. It is up to you if you want to give me the other 25 USD . . ." and a 2011 email from Aliotta stating, "THESE PRICES INCLUDE MY 25$ (sic) COMMISSION."

In approximately September 2021, the same supplier contacted ISC inquiring about missing payments from REI, despite ISC having paid REI for the relevant orders. *Id.* ¶ 307. When ISC confronted Aliotta about the issue, Aliotta responded that he had sent the funds into an account held by his UK attorney, pending resolution of a lawsuit REI filed against the supplier for disclosing the pricing information to ISC. *Id.* ¶ 308. ISC then obtained numerous invoices that the suppliers had sent to REI. *Id.* ¶ 309. After comparing the purchase orders it received from REI to the invoices provided to REI by the suppliers, ISC discovered over forty instances in which it alleges REI misrepresented the supplier prices. *Id.* ¶ 310.

A portion of the alleged fraudulent proceeds were transferred to Aliotta Holdings and were then further distributed to Aliotta and his family. *Id.* ¶¶ 312-13. Aliotta then transferred a portion of those funds back to Aliotta Holdings. *Id.* ¶ 314.

On March 2, 2017, "separate and apart from the foregoing" allegations and "irrespective of the parties' understanding regarding how the offer prices were to be calculated," REI emailed ISC, informing it that, after "relentless talks," REI convinced a supplier, UAG, to reduce its price on several shipments of product. *Id.* ¶ 315. Aliotta stated that the supplier would reduce the price on (a) the first shipment of 700 MT of product from $2,860 per MT to $2,800 (supplier price of $2,783 per MT and $13 per MT in commissions), (b) the second shipment of 500 MT of product from $2,700 per MT to $2,650 per MT (supplier price of $2,633 per MT and $17 per MT in commissions), and (c) the third shipment of 500 MT of product from $2,650 per MT to $2,600 per MT (no commissions). *Id.* ¶ 316, Ex. D. Aliotta told ISC that, in order to secure this deal, it needed to purchase an additional 1,000 MT of product for $2,450 which Aliotta said was the "lowest possible price" and the "rock bottom achievable." *Id.* ¶ 317, Ex. D.

ISC agreed to contract with REI for the purchase of the product based on Aliotta's March 2, 2017 representations on supplier price and commissions. *Id.* ¶ 321. But the prices included in the purchase orders between REI and ISC, and those communicated to ISC by Aliotta, did not accurately represent the supplier prices or REI's commissions. *Id.* ¶¶ 321-26. In fact, ISC discovered that the suppliers were charging less than Aliotta represented, increasing REI's commissions beyond what Aliotta told ISC REI would collect. *Id.* For example, ISC discovered that the supplier was not charging $2,783 per MT for the 700 MT of product but was rather only charging $2,525. *Id.* ¶ 323. This resulted in REI collecting $275 per MT in commissions instead of the $13 per MT that Aliotta told ISC REI would collect. *Id.*

## C.    Procedural Background

On July 19, 2022, ISC filed its Initial Complaint against Defendants. D.E. 1. Defendants moved to dismiss the Initial Complaint for lack of personal jurisdiction over certain Defendants pursuant to Federal Rule of Civil Procedure 12(b)(2), as well as for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). D.E. 13. ISC then moved for leave to file a First Amended Complaint ("FAC"). D.E. 22. Before either motion was decided, the parties consented to permit ISC to file a FAC. D.Es. 26, 30.

On December 7, 2022, ISC filed the FAC. Defendants subsequently moved to dismiss the FAC for lack of personal jurisdiction over Aliotta and the Aliotta Entities pursuant to Federal Rule of Civil Procedure 12(b)(2), as well as for failure to state a claim against Defendants pursuant to Rule 12(b)(6). D.E. 33-1. The Court deferred its ruling on personal jurisdiction over Aliotta until it could determine whether ISC states a plausible claim that Aliotta's individual actions were tortious in nature. D.E. 41 at 9. The Court granted limited jurisdictional discovery as to the

"Aliotta Entities"[6] to determine whether they had minimum contacts with New Jersey. *Id.* at 12. As to Defendants' Rule 12(b)(6) arguments, the Court (1) dismissed Count I (Fraud in the Inducement) without prejudice, *id.* at 14-16; (2) dismissed Count II (Mail/Wire Fraud) with prejudice, *id.* at 16; (3) dismissed Count III (Unjust Enrichment) as to the Aliotta Entities without prejudice but upheld it as to REI and Aliotta, *id.* at 17-18; (4) did not dismiss Count IV (Breach of Duty of Loyalty) and determined that the claim was only plead as to Aliotta, *id.* at 19-22; (5) dismissed Count V (Conversion) without prejudice, *id.* at 22-25; and (6) dismissed Count VI (Civil Conspiracy) without prejudice, *id.* at 25-28.

Plaintiff filed a Second Amended Complaint on May 25, 2023, followed by the TAC on October 10, 2023.  D.Es. 46, 53.  Defendants move to dismiss the TAC.  Mot.  Plaintiff opposes. D.E. 55 ("Opp'n").  Defendants reply.  D.E. 59 ("Reply").

## II.    LEGAL STANDARDS

### A.    Federal Rule of Civil Procedure 12(b)(2)

Rule 12(b)(2) permits the dismissal of a case for "lack of personal jurisdiction."  It is the plaintiff's burden to demonstrate "the facts that establish personal jurisdiction."  *Pinker v. Roche Holdings Ltd.*, 292 F.3d 361, 368 (3d Cir. 2002).  Unlike a motion to dismiss for failure to state a claim, the plaintiff may not rely solely on the pleadings to overcome a defendant's jurisdictional defense; instead, the plaintiff must demonstrate by sworn affidavits or other competent evidence that jurisdiction is proper. *See, e.g.*, *Time Share Vacation Club v. Atl. Resorts, Ltd.*, 735 F.2d 61, 66 n.9 (3d Cir. 1984); *Weber v. Jolly Hotels*, 977 F. Supp. 327, 331 (D.N.J. 1997).  In response, the defendant "must present a compelling case that the presence of some other considerations

---

[6] Additional non-REI entities owned by Aliotta were previously named as defendants.  Now, the only entities listed as defendants in the TAC are REI and Aliotta Holdings.

would render jurisdiction unreasonable." *Mellon Bank (East) PSFS, Nat'l Ass'n v. Farino*, 960 F.2d 1217, 1226 (3d Cir. 1992) (citation omitted).

In reviewing a motion to dismiss for lack of personal jurisdiction, the Court takes the plaintiff's well-pled allegations as true and construes all disputed facts in the plaintiff's favor. *See, e.g.*, *Miller Yacht Sales, Inc. v. Smith*, 384 F.3d 93, 97 (3d Cir. 2004); *Carteret Sav. Bank v. Shushan*, 954 F.2d 141, 142 n.1 (3d Cir. 1992). Moreover, the reviewing court "may always revisit the issue of personal jurisdiction if later revelations reveal that the facts alleged in support of jurisdiction remain in dispute." *Otsuka Pharms. Co. v. Mylan Inc.*, 106 F. Supp. 3d 456, 462 n.5 (D.N.J. 2015) (citation omitted).

A district court analyzes personal jurisdiction based on the law of the state where it sits. Fed. R. Civ. P. 4(k). Because New Jersey's long-arm statute[7] extends jurisdiction over non-residents "to the uttermost limits permitted by the U.S. Constitution," the Court's inquiry collapses into a constitutional analysis. *Genesis Bio Pharms., Inc. v. Chiron Corp.*, 27 F. App'x 94, 97 (3d Cir. 2002) (quoting *Charles Gendler & Co. Inc. v. Telecom Equip Corp.*, 102 N.J. 460, 468 (1986)).

There are two types of personal jurisdiction: general jurisdiction and specific jurisdiction. *O'Connor v. Sandy Lane Hotel Co.*, 496 F.3d 312, 317 (3d Cir. 2007) (citing *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414-15 & n. 9 (1984)). "General personal jurisdiction is broader than specific personal jurisdiction, reaching all potential claims against the defendant regardless of their connection to the state. By contrast, specific personal jurisdiction only reaches claims that arise out of or relate to the minimum contacts a plaintiff can demonstrate between the defendant and the forum state." *Fischer v. Federal Express Corp.*, 42 F.4th 366, 383

---

[7] N.J. Ct. R. 4:4-4.

(3d Cir. 2022) (citing *Bristol-Myers Squibb Co. v. Superior Ct. of Cal., San Francisco Cty.*, 582 U.S. 255, 256 (2017)).

Absent consent, *see Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 n.14 (1985), or in-state service of process, *see Burnham v. Super. Ct. of Cal.*, 495 U.S. 604, 622 (1990), the "paradigm forum for the exercise of general jurisdiction is the individual's domicile." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 924 (2011). General jurisdiction over a corporation exists only where the corporation is "at home," which "generally is restricted to the corporation's state of incorporation or the state of its principal place of business." *Fischer*, 42 F.4th at 383 (citing *Daimler AG v. Bauman*, 571 U.S. 117, 122 (2014)). In "exceptional" cases, "a corporate defendant's operations in another forum may be so substantial and of such a nature as to render the corporation at home in that State." *BNSF Railway v. Tyrell*, 581 U.S. 402, 403 (2017). However, "a corporation that operates in many places can scarcely be deemed at home in all of them." *Id.* at 414.

Specific jurisdiction may be found where the defendant has "certain minimum contacts" with the forum state "such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (cleaned up). The Third Circuit has broken this test down into a three-part inquiry: (1) whether the defendant "purposefully directed [its] activities' at the forum," (2) whether the plaintiff's claims "arise out of or relate to" defendant's purposefully targeted activities in the forum," and (3) whether the exercise of specific jurisdiction "comport[s] with fair play and substantial justice." *O'Connor*, 496 F.3d at 317, 318, 324 (cleaned up).

### B.      Federal Rule of Civil Procedure 12(b)(6)

Rule 12(b)(6) permits the dismissal of a case for failure to state a claim.  In reviewing a 12(b)(6) motion, the reviewing court accepts all well-pled facts as true, construes the complaint in the plaintiff's favor, and determines "whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief."  *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008) (cleaned up).  To survive a 12(b)(6) challenge, the plaintiff's claims must be facially plausible, meaning that the well-pled facts "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  The allegations must be "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  Finally, "[i]n deciding a Rule 12(b)(6) motion, a court must consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents."  *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010).

## III.     ANALYSIS

### A.      Personal Jurisdiction – Federal Rule of Civil Procedure 12(b)(2)

Defendants argue that the Court lacks both general and specific jurisdiction over Aliotta and Aliotta Holdings (collectively, the "Aliotta Defendants").[8]  Mot. at 6-15.  ISC concedes that general jurisdiction is improper[9] and maintains that specific jurisdiction over the Aliotta Defendants is proper because they could reasonably anticipate being haled into court in New

---

[8] Defendants concede that the Court may properly exercise personal jurisdiction over REI.  *See* Mot. at 1 n.1.

[9] Therefore, the Court will focus on whether specific jurisdiction may be exercised over the Aliotta Defendants.

Jersey. *See* Opp'n at 9-14. The Court previously allowed limited jurisdictional discovery as to the "Aliotta Entities," which includes Aliotta Holdings, to resolve the issue if whether the Court may exercise jurisdiction over them. D.E. 41 at 12. The Court finds that it has personal jurisdiction over Aliotta, but not over Aliotta Holdings.

1.   *The Court may exercise specific jurisdiction over Aliotta because he has sufficient minimum contacts with New Jersey*

Aliotta argues that he is not subject to this Court's specific jurisdiction because (1) the jurisdictional allegations in the TAC speak only of "personal family" contacts with New Jersey or business conducted on behalf of REI and (2) the fiduciary shield doctrine prohibits specific jurisdiction over Aliotta based on his contacts on behalf of REI. *See* Mot. at 12-15. ISC argues that the fiduciary shield doctrine does not apply here since ISC alleges that Aliotta's actions were tortious in nature. *See* Opp'n at 9-12. The Court agrees with ISC.

As a general rule, personal jurisdiction cannot be exercised over an individual whose contacts with the forum state are in his corporate capacity. *Norben Imp. Corp. v. Metro. Plant & Flower Corp.*, No. 5-cv-54, 2005 WL 1677479, at *5 (D.N.J. Jul. 15, 2005) (citations omitted); *FlagHouse, Inc. v. ProSource Dev., Inc.*, 528 F. App'x 186, 189 (3d Cir. 2013) (emphasizing that "'jurisdiction over an employee does not automatically follow from jurisdiction over the corporation which employs him'") (quoting *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 781 n.13 (1984)). This is commonly referred to as the "fiduciary shield doctrine."

However, this general rule has "limited reach" with respect to tort cases. *Commence Corp. v. Selltis, LLC*, No. 05-cv-5097, 2006 WL 561971, at *2 (D.N.J. Mar. 6, 2006) (citing *In re Royal Dutch/Shell Transport Sec. Litig.*, 380 F. Supp. 2d 509, 550 (D.N.J. 2005)). Specifically, where "a corporate officer has personally engaged in [tortious] activity for which individual liability may attach, then the corporate shield may not be used to defend against personal jurisdiction." *Norben*,

10

2005 WL 1677479, at *5 (citing *Donner v. Tams-Witmark Music Library*, 480 F. Supp. 1229, 1234 (E.D. Pa. 1979)); *see also Keeton*, 465 U.S. at 781 n.13 (rejecting "the suggestion that employees who act in their official capacity are somehow shielded from suit in their individual capacity") (citing *Calder v. Jones*, 465 U.S. 783, 789 (1984)); *Educational Testing Serv. v. Katzman*, 631 F. Supp. 550, 557 (D.N.J. 1986) (quoting *Donner v. Tams-Witmark Music, Library, Inc.*, 40 F. Supp. 1229, 1234 (E.D. Pa. 1979) ("[W]e hold that Aborn's allegedly tortious conduct in his capacity as president . . . may be considered to determine whether the court has jurisdiction over Aborn as an individual defendant.")); *Par Pharm., Inc. v. QuVa Pharma, Inc.*, No. 17-cv-6115, 2019 WL 356549, at *11 (D.N.J. Jan. 28, 2019) (quoting *Schley v. Microsoft Corp.*, No. 09-cv-3589, 2008 WL 5075266, at *13 (D.N.J. Nov. 24, 2008)) ("[W]here a defendant 'was personally involved in committing various torts . . . his [] actions would subject him [] to jurisdiction even under the fiduciary shield doctrine.'").

The Court previously deferred deciding whether it has specific jurisdiction over Aliotta until it could determine whether ISC could state a claim that Aliotta's actions, on behalf of REI, were tortious in nature. D.E. 41 at 9. As discussed, *infra*, the Court concludes that ISC has stated a tort claim as to Aliotta. As such, the fiduciary shield doctrine does not protect Aliotta from jurisdiction based on his actions on behalf of REI, directed at New Jersey. *See Keeton*, 465 U.S. at 781 n.13; *Norben*, 2005 WL 1677479, at *5.

The Court finds that ISC adequately alleges that Aliotta purposefully directed his allegedly tortious activities at New Jersey, this litigation arises out of those very same activities, and the exercise of jurisdiction comports with fair play and substantial justice. *See Quality Int'l Packaging, Ltd.*, 2015 WL 4749156, at *2. The TAC contains allegations that Aliotta knowingly directed numerous false communications to ISC in New Jersey with the intention that ISC rely on

11

those statements when contracting with REI.  TAC ¶¶ 10(a), 27-29; 316-17, Exs. C, D; Declaration

of Matthew Berliner, D.E. 55-1 ¶¶ 4, 7.  As discussed *infra*, the Court finds that these alleged

actions are directly related to at least one properly alleged tort—Fraud in the Inducement.  This

litigation arises out of and directly relates to that alleged conduct.  *See generally* TAC.

Furthermore, exercising jurisdiction as to Aliotta comports with fair play and substantial

justice.  "The existence of minimum contacts makes jurisdiction presumptively constitutional, and

the defendant 'must present a compelling case that the presence of some other considerations

would render jurisdiction unreasonable.'"  *O'Connor*, 496 F.3d at 324 (quoting *Burger King*, 471

U.S. at 477).  There are several factors courts should consider when balancing jurisdictional

reasonableness, including (1) "the burden on the defendant," (2) "the forum State's interest in

adjudicating the dispute," (3) "the plaintiff's interest in obtaining convenient and effective relief,"

(4) "the interstate [and international] judicial system's interest in obtaining the most efficient

resolution of controversies," and (5) "[t]he procedural and substantive interests of other nations."

*Id.* (quoting *Burger King*, 471 U.S. at 477 and *Asahi Metal Indus. Co. v. Superior Court*, 480 U.S.

102, 113, 115 (1987)) (internal quotation marks omitted) (alterations in original).  Aliotta has not

argued that any of these considerations weigh against a finding of specific jurisdiction.

Because exercising jurisdiction as to Aliotta is reasonable and comports with fair play and

substantial justice, the Court will exercise specific jurisdiction.[10]

### 2.   *This Court lacks jurisdiction over Aliotta Holdings*

Aliotta Holdings argues that, even after jurisdictional discovery, the TAC's only allegation

against it is that it received a benefit through Aliotta's alleged fraudulent actions directed at New

---

[10] Because the Court concludes that it has jurisdiction over Aliotta under the traditional minimum contacts analysis, it need not consider whether the "effects test," *see IMO Indus. v. Kiekert AG*, 155 F.3d 254. 265-66 (3d Cir. 1998), is met as to Aliotta.

Jersey, but that Aliotta's conduct cannot be imputed to Aliotta Holdings. Mot. at 8-11. The Court agrees.

ISC argues that the "effects test" allows for jurisdiction over Aliotta Holdings. Opp'n at 8-9. In order to exercise specific jurisdiction based on the effects test, a plaintiff must demonstrate: "(1) [t]he defendant committed an intentional tort; (2) [t]he plaintiff felt the brunt of the harm in the forum where suit was brought; [and] (3) [t]he defendant aimed his tortious conduct at the forum such that the forum can be said to be the focal point of the tortious activity." *IMO Indus.*, 155 F.3d at 265-66. The first prong hinges on whether the plaintiff "has pointed to acts undertaken by [the defendant] which demonstrate that it 'expressly aimed' its tortious conduct at New Jersey." *Id.* at 266 ("In the typical case, this will require some type of 'entry' into the forum state by the defendant."). Only if this prong is satisfied does the Court need to consider the second and third prongs. *See id.* "[T]he mere allegation that the plaintiff feels the effect of the defendant's tortious conduct in the forum because the plaintiff is located there is insufficient to satisfy [the effects test]." *Id.* at 263-64.

The Court previously found that, based on the allegations in the FAC, the connection ISC drew between the "Aliotta Entities'" (including Aliotta Holdings') alleged fraudulent conduct and New Jersey was "far too attenuated to satisfy the first prong of the effects test." D.E. 41 at 10 (citing *Lasala v. Marfin Popular Bank Pub. Co.*, No. 09-cv-968, 2010 WL 715482, at *2 (D.N.J. 2010)). The Court explained that "[b]eyond the attenuated connection between the Aliotta Entities and ISC—that the Aliotta Entities received monies from REI/Aliotta which originated from ISC (based in New Jersey)—there is no apparent tie between the Aliotta Entities and New Jersey" and "no factual allegation that the Aliotta Entities directed their fraudulent conduct at ISC in New Jersey." D.E. 41 at 10-11.

However, the Court allowed limited jurisdictional discovery for ISC to determine whether Aliotta's conduct may be imputed to the Aliotta Entities.  D.E. 41 at 11.  Having had that opportunity, ISC has still failed to allege contacts on behalf of Aliotta Holdings.  ISC argues that Aliotta's numerous contacts with New Jersey form the basis for jurisdiction over Aliotta Holdings.  Opp'n at 12-14.  The Court disagrees.

Aliotta Holdings is a company organized under the laws of England and Wales.  TAC ¶ 4.  ISC does not allege that Aliotta Holdings has any presence in New Jersey, let alone the United States.  *See generally* TAC.  ISC argues in its brief that Aliotta's conduct alleged in the TAC was done on behalf of *both* REI and Aliotta Holdings.  Opp'n at 13.  However, the TAC does not support this reading.  Apart from the conclusory allegation that "Aliotta was acting for the benefit of Aliotta Holdings," TAC ¶ 11, every factual allegation against Aliotta alleged that he acted on behalf of REI.  *See generally* TAC; *e.g.,* TAC ¶¶ 46, 94, 315-320.  Indeed, the factual support included by ISC in support of jurisdiction plainly shows Aliotta acting on behalf of REI, not Aliotta Holdings.  *See* TAC Exs. A-F.  Therefore, despite jurisdictional discovery, ISC has not adequately alleged that Aliotta's actions were taken on behalf of Aliotta Holdings.

ISC also argues that funds received by Aliotta Holdings are enough to subject it to jurisdiction in New Jersey.  The Court disagrees.  Defendants point out, and ISC does not dispute, that all the transactions involving Aliotta Holdings occurred in Europe.  Mot. at 8-9.  ISC does not provide any authority, nor is the Court aware of any, that provides for personal jurisdiction due to transactions occurring overseas.  To the contrary, the mere receipt of funds by a foreign entity is insufficient to confer personal jurisdiction over that entity.  *See Di Maggio v. Giuseppe*, No. 96-cv-4682, 1997 WL 360945, at *2 (E.D. Pa. June 24, 1997) (holding that a foreign bank that merely received funds transferred pursuant to a letter of credit at issue was not subject to jurisdiction in

Pennsylvania).  Therefore, this Court lacks jurisdiction over Aliotta Holdings and will dismiss the TAC in its entirety as to Aliotta Holdings, without prejudice.  *See Kennedy v. Hoegh Autoliners Shipping PTE*, No. 18-cv-8599, 2021 WL 7904032, at *9 (D.N.J. Feb. 17, 2021) (quoting *EF Operating Corp. v. Am. Bldgs.*, 993 F.2d 1046, 1048-49 (3d Cir. 1993)) ("As a general matter, 'dismissal for lack of personal jurisdiction . . . is a dismissal without prejudice.'").

**B.    Failure to State a Claim – Federal Rule of Civil Procedure 12(b)(6)[11]**

*1.    Count I – fraud in the inducement will be dismissed without prejudice*

Since ISC filed the FAC, it has clarified its position with respect to fraud in the inducement. ISC previously appeared to argue that its fraud claim was based on a breach of an "understanding" between IAC and REI regarding the amount of commissions REI would charge.  *See* D.E. 35 at 19-23.  Based on that argument, the Court previously dismissed Plaintiff's fraud in the inducement claim without prejudice for failing to adequately allege that the underlying "understanding" was a contract that had been breached that could form the basis for a fraud in the inducement claim.  D.E. 41 at 14-15.

Plaintiff now appears to argue, albeit vaguely, that it is not alleging the "understanding" is the contract that has been breached, but rather that the "understanding" is a "shorthand" for "describing ISC's reasonable reliance on Mr. Aliotta's representations that commissions would not exceed $50 per MT."  Opp'n at 24.  The contracts that Plaintiff alleges it was fraudulently induced into entering are "approximately 45" purchase orders that REI sent and ISC accepted. Opp'n at 1.

But the alleged misrepresentations remain unclear.  For example, ISC alleges that, beginning in April 2016, REI and Aliotta "began misrepresenting suppliers' offers by inflating the

---

[11] The Court will not address the allegations against Aliotta Holdings since it lacks jurisdiction over that entity.

suppliers' prices and keeping the difference as additional commissions."  TAC ¶ 33.  However, the TAC also alleges misrepresentations made "prior" to the issuance of the purchase orders and other "oral and written" misrepresentations by Aliotta and REI.  *E.g.*, TAC ¶¶ 29, 38.  As such, the Court now understands that Plaintiff is alleging, at least in part, that Aliotta and REI falsely represented that the prices included in subsequent purchase orders would represent the suppliers' prices plus no more than $50 per MT in commissions, where, in fact, the prices in those purchase orders included more money for REI than was represented.

Apparently believing that Plaintiff's argument hinges on a breach of the supposed "understanding," Defendants argue (1) that ISC has not pled actions or misstatements that predate the "understanding," (2) the purchase orders do not contain statements that could be viewed as misrepresentations as to the amount of commissions that REI would charge, (3) the TAC fails to plead fraud with the requisite specificity, (4) ISC's description of the "understanding" is too vague to provide Defendants with fair notice of what the claim is, (5) the TAC does not plead that REI shared ISC's "understanding" sufficiently to create a binding obligation, (6) breach of an "understanding" about a past promise cannot support a fraudulent inducement claim, and (7) ISC's fraudulent inducement claims must be dismissed under the economic loss doctrine.  Mot. at 18-32. Many of Defendants' arguments understandably miss the mark given the confusion in Plaintiff's pleading.  However, now that Plaintiff has clarified its argument, the Court finds that Plaintiff has adequately alleged the underlying contracts but has not alleged the supposed misrepresentations regarding what the prices in the contracts were comprised of with sufficient particularity to satisfy Rule 9(b)'s heightened pleading standard.

To state a fraud in the inducement claim, a plaintiff must establish: "(1) a material representation of a presently existing or past fact; (2) made with knowledge of its falsity; and (3)

with the intention that the other party rely thereof; (4) resulting in reliance by that party; (5) to his detriment." *RNC Sys. v. Modern Tech. Group, Inc.*, 861 F. Supp. 2d 436, 451 (D.N.J. 2012) (internal citations omitted). Additionally, the plaintiff "must show that the opposing party 'knowingly omitted material facts in the execution of the [relevant contract].'" *GE Capital Corp. v. Oncology Assocs. of Ocean County, LLC*, No. 10-cv-1972, 2014 WL 4793484, at *3 (D.N.J. Sept. 25, 2014) (quoting *The Mall at IV Grp. Props., LLC v. Roberts*, No. 02-cv-4692, 2005 WL 3338369, at *1 (D.N.J. Dec. 8, 2005)) (alteration in original). Such claims must comply with Federal Rule of Civil Procedure 9(b)'s heightened pleading standard since they sound in fraud. *See G&F Graphic Servs. v. Graphic Innovators, Inc.*, 18 F. Supp. 3d 583, 593-94 (D.N.J. 2014) (applying Rule 9(b) to fraud in the inducement claim). "To satisfy this standard, the plaintiff must plead or allege the date, time and place of the alleged fraud or otherwise inject precision or some measure of substantiation into a fraud allegation." *Frederico v. Home Depot*, 507 F.3d 188, 200 (3d Cir. 2007)).

Here, Defendants are correct that there must be a contract underlying a fraud in the inducement claim. *See GE Capital Corp.*, 2014 WL 4793484, at *3. However, those contracts are adequately alleged. Contracts for the sale of goods are governed by the Uniform Commercial Code ("UCC").[12] "Unless otherwise unambiguously indicated by the language or circumstances[,] (a) an offer to make a contract shall be construed as inviting acceptance in any manner and by any medium reasonable in the circumstances; [and] (b) an order or other offer to buy goods for prompt or current shipment shall be construed as inviting acceptance either by a prompt promise to ship or by the prompt or current shipment of conforming . . . goods." N.J.S.A. 12A:2-206(1). The TAC has adequately alleged the existence of contracts that ISC alleges it was fraudulently induced

---

[12] N.J.S.A. 12A:1-101, *et seq.*

into entering as evidenced by the orders memorialized in the purchase orders, TAC Ex. A, and the shipment of those orders.

Defendants are also correct to state a claim for fraud in the inducement, as opposed to breach of contract, the misrepresentations alleged must be "*extraneous* to the parties' contract," *Montclair State Univ. v. Oracle USA, Inc.*, No. 11-cv-2867, 2012 WL 3647427, at *4 (D.N.J. Aug. 23, 2012) (emphasis in original), and that "if a party makes a promise, contracts to perform it, and then fails to do so, such failure to perform is merely a breach of contract," *Jacobsen Diamond Ctr., LLC v. ADT Security Servs., Inc.*, No. A-1578-14T1, 2016 WL 3766236, at *9 (N.J. App. Div. July 15, 2016).   Contrary to Defendants' position however, the Court finds that the TAC does allege extraneous misrepresentations by Aliotta and REI.  It alleges Aliotta and REI made oral and written misrepresentations to ISC, before the issuance of the purchase orders, that the prices included in the purchase orders represented the seller's price plus no more than $50 per MT of commissions for REI.[13]  *See, e.g.*, TAC ¶¶ 29, 35-38, Ex. C.[14]

Defendants do not specifically argue that the TAC fails to allege that the misstatements were made with knowledge of their falsity, with the intention that ISC rely on them, and that ISC in fact did rely on them to its detriment.  The Court finds that these elements of fraud in the inducement are adequately alleged in the TAC.

---

[13] The TAC references an "understanding of the parties." *E.g.*, TAC ¶¶ 27-29.  For purposes of ISC's fraud in the inducement claim, the relevant allegations with respect to such "understanding" are the actual statements made by Aliotta and REI that were allegedly false and designed to induce ISC to contract with REI.  *See Montclair State Univ.*, 2012 WL 3647427, at *4.

[14] Communications attached to the TAC as Exhibit C do not appear to relate to contracts other than the specific contracts being discussed in those communications.  However, at this stage, ISC need only meet the pleading standard set forth in Rule 9(b).  To ultimately prevail on its fraud in the inducement claims, however, ISC will need to prove the existence of misrepresentations that relate to the contracts it claims it was misled into entering.

However, ISC fails to specify, as Rule 9(b) requires, the "date, time and place" of the alleged misstatements "or otherwise inject precision or some measure of substantiation" into its fraud in the inducement allegation in Count I. *Frederico*, 507 F.3d 188, 200 (3d Cir. 2007)). The TAC does not allege with any specificity when and where the alleged prior oral and written misrepresentations from Aliotta and REI took place and the specific contents of those communications.[15] This is in stark contrast to ISC's Count II fraud in the inducement claim which does provide the requisite details surrounding the alleged misrepresentations. *See infra*. Therefore, the Court finds that ISC fails to state a claim for fraud in the inducement in Count I because it has not satisfied the Rule 9(b) heightened pleading standard with respect to the alleged misrepresentations at issue.

This count will be dismissed without prejudice so Plaintiff has the opportunity to attempt to adequately plead the detailed factual allegations required pursuant to Rule 9(b) and so Defendants have a fair chance, if they believe that any additional pleading is still inadequate, to challenge the specificity of those allegations. Because amendment under these circumstances is neither inequitable nor futile, the Court must dismiss Count I without prejudice. *See Phillips*, 515 F.3d at 245.

---

[15] To the extent that ISC argues that the purchase orders themselves were the misstatements at issue, the Court notes that those "statements" in isolation would be inadequate. The Court has reviewed the purchase orders in Exhibit A to the TAC. *See McTernan v. City of York, Penn.*, 577 F.3d 521, 526 (3d Cir. 2009) (holding that in addition to the complaint itself, a court deciding a motion to dismiss can review documents attached to the complaint). The purchase orders contain prices for materials that REI charged ISC. Any representations that the prices contained therein were the supplier's price plus no more than $50 per MT in commissions must have come from elsewhere as that representation is not included in the purchase orders themselves.

2.      *Count II – fraud in the inducement will not be dismissed as to REI and
Aliotta*

Defendants argue that the fraud in the inducement allegation in Count II should be dismissed for the same reasons as Count I.  Mot. at 18-32.  The Court disagrees.

As Plaintiff argues, Opp'n at 17-22, 31-32,[16] Count II provides ample detail regarding the alleged misrepresentations.  TAC ¶¶ 315-29, 341-48, Exs. D, F.  Specifically, ISC alleges that, on March 2, 2017, "irrespective of the parties' understanding regarding how the offer prices were to be calculated," Aliotta and REI informed ISC that, after "relentless talks," REI convinced a supplier, UAG, to reduce its price on several shipments of product.  *Id.* ¶ 315.  Aliotta and REI allegedly stated that (a) the supplier would reduce the price on a first shipment of 700 MT of product from $2,860 per MT to $2,800 and that REI would charge commissions of $13 per MT for that shipment; (b) the supplier would reduce the price on a second shipment of 500 MT of product from $2,700 per MT to $2,650 per MT and that REI would charge commissions of $17 per MT for that shipment; and (c) the supplier would reduce the price of a third shipment of 500 MT of product from $2,650 per MT to $2,600 per MT and that REI would charge no commissions for that shipment.  *Id.* ¶ 316, Ex. D.  Aliotta and REI also allegedly told ISC that, in order to secure this deal from the supplier, ISC would be required to purchase an additional 1,000 MT of product for $2,450 which, according to Aliotta, was the "lowest possible price" and the "rock bottom achievable." *Id.* ¶ 317, Ex. D.

ISC further alleges that, to induce ISC into contracting with REI, Aliotta and REI misrepresented the suppliers' prices and REI's commissions despite knowing that, in fact, the prices represented lower supplier costs and higher commissions than represented to ISC.  *See id.*

---

[16] Plaintiff's argument that Defendants do not seek dismissal of Count II, Opp'n at 16-17, is inaccurate.  Defendants argued similarly for the dismissal of both fraud in the inducement counts.  Mot. at 18-32.

¶¶ 320-26, Ex. F.  According to ISC, had it known that the prices in the purchase orders represented lower prices from the suppliers and higher commissions for REI than REI and Aliotta represented beforehand, it would not have accepted REI's offer and would not have parted with over $578,900. *Id.* ¶¶ 327-328, Ex. F.  The Court finds that these allegations adequately state the elements of Fraud in the Inducement as to Aliotta and REI.  *See RNC Sys.*, 861 F. Supp. 2d at 451; *GE Capital Corp.*, 2014 WL 4793484, at *3.

The economic loss doctrine does not preclude Plaintiff from pursuing Count II.  The "economic loss doctrine 'prohibits plaintiffs from recovering in tort economic losses to which their entitlement only flows from a contract.'"  *Braco Diagnostics, Inc. v. Bergen Brunswig Drug Co.*, 226 F. Supp. 2d 557. 562 (D.N.J. 2002) (quoting *Duquesne Light Co. v. Westinghouse Elec. Corp.*, 66 F.3d 604, 618 (3d Cir. 1995)) (applying New Jersey law).  Based on the factual allegations underlying Count II, the economic loss doctrine does not apply.  This is because ISC does not allege that the fraud is based in nonfulfillment of a warranty or guarantee contained in the contract itself, but rather alleges that Aliotta and REI misrepresented, through separate pre-contractual communications, what the prices contained in the contract were made up of.  TAC ¶¶ 316-17, Ex. D.  Under these circumstances, ISC is not prohibited from pursuing a tort claim.  *See G&F Graphic Servs.*, 18 F. Supp. 3d at 591 (citing *Lithuanian Commerce Corp. v. Sara Lee Hosiery*, 219 F. Supp. 2d 600, 607 (D.N.J., 2002)).  Therefore, the Court will not dismiss Count II as to REI and Aliotta.

### 3.    Count III – unjust enrichment will not be dismissed as to REI and Aliotta

The Court previously upheld ISC's unjust enrichment count in the FAC as to REI and Aliotta.  D.E. 41 at 16-18.  Nevertheless, Defendants argue that Count III of the TAC should be dismissed in its entirety because the TAC does not contain "sufficient allegations that Defendants committed any wrongdoing."  Mot. at 34.  Plaintiff argues that the Court should not dismiss this

Count for the same reasons that it did not dismiss it as to REI and Aliotta in the FAC.  *See* Opp'n at 39.

To state a claim for unjust enrichment, a plaintiff must "show both that [the] defendant received a benefit and that retention of that benefit without payment would be unjust."  *Tracy v. FileNet Corp.*, No. 06-cv-1962, 2007 WL 4591384, at *10 (D.N.J. Dec. 28, 2007) (quoting *VRG Corp. v. GKN Realty Corp.*, 135 N.J. 539, 554 (1994)).  "Recovery under a theory of unjust enrichment is not appropriate, however, when a valid, unrescinded contract governs the rights of the parties."  *Id.* (citations omitted).

ISC alleges REI and Aliotta told it that the prices in the purchase orders represented the supplier's price plus no more than $50 per MT in commissions (and less in some instances).  According to ISC, had it known the prices on the purchase orders in fact represented lower supplier prices and higher commissions than what REI and Aliotta claimed, it would not have agreed to those orders and would therefore never have paid ISC the affected sums.  Furthermore, ISC is not alleging its rights are governed under a contract that was breached as it is not alleging that REI failed to deliver the products listed on the purchase orders or otherwise breached the terms within the four corners of the contracts. *See id.*  Therefore, ISC adequately states a claim for unjust enrichment as to Aliotta and REI.

> 4. *Count IV – breach of the duty of loyalty will be dismissed with prejudice as to REI but will not be dismissed as to Aliotta*

Defendants similarly argue that Count IV should be dismissed because the TAC does not allege any wrongdoing by Defendants.  Mot. at 34.  Plaintiff argues that the Court should not dismiss this Count for the same reasons as it did not dismiss it in the FAC.  Opp'n at 39.  This Court previously treated ISC's breach of the duty of loyalty allegation as made only against Aliotta. D.E. 41 at 19 n.18.  ISC does not dispute this characterization.  However, to the extent the TAC still does not make absolutely clear that it is pled only as to Aliotta, the Court will dismiss Count IV to the extent it is alleged against REI, but will not dismiss Count IV as to Aliotta.

To state a claim for breach of a fiduciary duty, such as a duty of loyalty, a plaintiff must demonstrate: "(1) a fiduciary duty existed between the plaintiff and the defendant, (2) the defendant breached that duty, and (3) damages as a result of the breach." *Rapaport v. Robin S. Weingast & Assocs.*, 859 F. Supp. 2d 706, 717 (D.N.J. 2012) (citations omitted).  Because "it is well established that a fiduciary's duties are not limitless, but are circumscribed by the parameters of the fiduciary relationship[,]" a plaintiff "must allege a duty that arises within the scope of the fiduciary relationship and that [the defendant] breached that particular duty." *Id.* at 717-18. "Fiduciaries breach their duty of loyalty by intentionally failing to act in the face of a known duty to act, demonstrating a conscious disregard for their duties." *In re Teleservices Group, Inc.*, No. 09-cv-1093, 2009 WL 4250055, at *7 (D.N.J. Nov. 25, 2009) (cleaned up).  Moreover, this duty requires that "the best interests of the corporation and its shareholders take precedence over any self-interest of a director . . . that is not shared by the stockholders generally." *Id.* (citation omitted). Furthermore, a duty of loyalty runs between a wholly owned subsidiary's directors and the parent because "'in a parent and wholly-owned subsidiary context, the directors of the subsidiary are obligated only to manage the affairs of the subsidiary in the best interests of the parent and its shareholders.'" *In re Teleglobe Communs. Corp.*, 493 F.3d 345, 366-67 (3d Cir. 2007) (quoting *Anadarko Petroleium Corp. v. Panhandle Eastern Corp.*, 545 A.2d 1171, 1174 (Del. 1988)); *see id.* at 367 ("[T]he only interest of a wholly owned subsidiary is serving its parent." (citation omitted)).

The Court previously held that ISC stated a claim for breach of the duty of loyalty as to Aliotta and not as to REI.  D.E. 41 at 19-22.  In so holding, the Court found (1) that as a director of ISC's wholly-owned subsidiary, ISC Europe, Aliotta owed a duty of loyalty to the parent, ISC; (2) ISC alleged the duty was breached since it alleges that Aliotta favored his (and REI's) personal

financial interest above that of ISC in taking excess commissions in transactions between REI and ISC; and (3) damages have been alleged.  *Id.*

For the reasons previously stated by the Court in its Opinion dismissing in part the FAC, D.E. 41 at 19-22, ISC has stated a claim in the TAC for breach of the duty of loyalty as to Aliotta and not as to REI.  As Plaintiff appears to concede that this claim is not brought against any defendant other than Aliotta and there is no indication that Plaintiff alleges that other defendants are, or could be, fiduciaries, amendment would be futile and therefore Count IV will be dismissed with prejudice as to REI.  *See Phillips*, 515 F.3d at 245.

> 5.   *Count V – conversion will be dismissed without prejudice as to the funds at issue in Count I and will not be dismissed as to the funds at issue in Count II*

Defendants argue that ISC's conversion claim fails because it has not alleged that Defendants exercised "wrongful" control over the funds at issue.  Mot. at 32-33.  Plaintiff argues that it did allege Defendants wrongfully exercised control over the funds since (1) they are the product of fraud and (2) the TAC alleges (and Defendants concede) that ISC demanded the return of the funds at issue but Defendants did not return the funds even after the demand.  Opp'n at 34-38.  The Court agrees with Defendants with respect to the funds at issue in Count I but not with respect to the funds at issue in Count II.

To maintain a claim for the conversion of money, a "plaintiff must 'establish that the tortfeasor exercised dominion over its money and repudiated the superior rights of the owner' and such 'repudiation must be manifested in the injured party's demand for funds and the tortfeasor's refusal to return the monies sought.'"  *Vita v. Vita*, No. 21-cv-11060, 2022 WL 376764, at *3 n.2 (D.N.J. Feb. 8, 2022) (quoting *Bondi v. Citigroup, Inc.*, 423 N.J. Super. 377, 432 (App. Div. 2011)); *see also First Am. Title Ins. Co. v. Sadek*, No. 11-cv-1302, 2017 WL 6663899, at *4 (D.N.J. Dec. 29, 2017) (explaining that a conversion claim has "three essential elements: (1) wrongful

24

exercise of dominion or control over the property of another; (2) the taking of property without authorization; and (3) that the taking was to the exclusion of the owner's rights to that property") (citations omitted).

Where the basis of the conversion claim is money, that money must be "identifiable as plaintiff's property or that the defendant was obligated to segregate such money for the plaintiff's benefit." *SalandStacy Corp. v. Freeney*, No. 11-cv-3439, 2012 WL 959473, at *8 (D.N.J. Mar. 21, 2012) (citations omitted). However, "the money need not be the identical bills or coins that belong to the [plaintiff]." *Chicago Title Ins. Co. v. Ellis*, 409 N.J. Super. 444, 455-56 (App. Div. 2009).

Moreover, "[c]onversion is an 'intentional tort' in that 'the defendant must have intended to exercise a dominion or control over the goods which is in fact inconsistent with the plaintiff's rights.'" *Sadek*, 2017 WL 6663899, at *4 (quoting *Ellis*, 409 N.J. Super. at 454) (citation omitted). However, the intent element for conversion requires a lower standard than that for fraud because "the defendant need not 'knowingly or intentionally act wrongfully for a conversion to occur.'" *Id.* (quoting *Ellis*, 409 N.J. Super. at 454) (citations omitted); *see id.* ("The defendant need not intend to harm the proper owner of the property or even know that the property belonged to that other person.") (citing *Ellis*, 409 N.J. Super. at 456); *Meisels v. Fox Rothschild LLP*, 240 N.J. 286, 304 (2020) ("A defendant may be liable for conversion even when 'he acted in good faith and in ignorance of the rights or title of the owner.'") (citations omitted).

As with the FAC, the TAC continues to reference "identifiable" money for purposes of ISC's conversion claim. *See* TAC Exs. A, F.

The Court also previously found that the FAC did not plead that Defendants exercised dominion or control over ISC's money without authorization. D.E. 41 at 24. The same is only

25

partially true in the TAC.  Conversion requires the "intentional exercise of dominion and control over chattel that seriously interferes with the right of another to control that chattel." *Meisels*, 240 N.J. at 305.  But "where the defendant lawfully acquired [the] plaintiff's property, the plaintiff must show that he demanded the return of the property and that the defendant refused compliance." *Id.* (citations omitted).  This demand is necessary because "[w]here possession is initially lawful, it is not tortious unless and until the [defendant in possession] acts in a way that conflicts with the [plaintiff's ownership] rights." *Id.* (citation omitted).  Therefore, when the plaintiff demands the "return of the property and the [defendant] refuses, then a conversion has occurred[,]" because a conflict with the plaintiff's ownership rights occurs.  *See id.*

At issue is whether Aliotta and REI's possession of the allegedly converted funds was initially lawful such that a demand for the return of funds is required for ISC to maintain its conversion claim.  As discussed *supra*, the Court will dismiss the Count I fraud in the inducement claims without prejudice.  Therefore, unless ISC is able to cure its Count I allegations, to proceed with its conversion claim over the funds at issue in Count I, ISC must allege that it demanded the return of those funds and that Aliotta and REI refused that demand.  ISC failed to allege such a demand.[17]  Therefore, Count V will be dismissed, without prejudice, to the extent relating to the funds at issue in Count I.[18]  However, as discussed *supra*, Count II does adequately plead fraud in the inducement.  Therefore, since ISC properly alleges that Aliotta and REI did not lawfully obtain

---

[17] ISC argues that Defendants acknowledged such a demand has been made but nevertheless does not include this allegation in its FAC.  ISC may not amend its complaint in its opposition brief. *See Pennsylvania ex rel. Zimmerman v. PepsiCo, Inc.*, 836 F.2d 173, 181 (3d Cir. 1988); *Talley v. United States*, No. 11-cv-1180, 2014 WL 282680, at *5 (D.N.J. Jan 24, 2014).  Should Plaintiff wish to include this allegation, it will need to do so in an amended complaint.

[18] This dismissal is without prejudice because it appears that Plaintiff is indeed arguing that such a demand was made, so an amendment to include that allegation would not be futile.  *See Phillips*, 515 F.3d at 245.

the funds at issue in Count II, the Court will not dismiss Count V to the extent relating to the funds at issue in Count II.[19]

### 6.    Count VI – civil conspiracy will be dismissed with prejudice

Defendants argue that ISC's civil conspiracy claim must be dismissed because "ISC has not alleged an underlying tort necessary to sustain its conspiracy claim." Mot. at 33.  Plaintiff counters by arguing that it has adequately pleaded an underlying tort so Count VI should not be dismissed.  Opp'n at 38.  The Court will dismiss Count VI, albeit not for the reason argued by Defendants.

To state a claim for civil conspiracy, a plaintiff must demonstrate a "combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties to inflict a wrong against or an injury upon another, and an overt act that results in damage." *Amgro, Inc. v. Lincoln General Ins. Co.*, 361 F. App'x 338, 347 n.11 (3d Cir. 2010) (quoting *LoBiondo v. Schwartz*, 199 N.J. 62, 102 (N.J. 2009)).  However, "a plaintiff need not prove that the unlawful agreement was express or that each participant in the conspiracy knew the 'exact limits of the illegal plan or the identity of all participants,' as long as [the] plaintiff alleges that each participant shared in 'the general conspiratorial objective.'"  *World Express & Connection, Inc. v. Crocus Invs., LLC*, No. 15-cv-8126, 2020 WL 5088633, at *20 (D.N.J. Aug. 28, 2020) (quoting *Morgan v. Union County Bd. of Chosen Freeholders*, 268 N.J. Super. 337, 365 (App. Div. 1993)).

---

[19] Should this case proceed to trial, Plaintiff would not be able to double-recover in its conversion claim the same funds at issue in its fraud in the inducement claim.  *See Pope v. Craftsman Builders, Inc.*, No. A-3138-09T4, 2013 WL 105283, at *7 (N.J. App. Div. Jan. 10, 2013). However, at this early stage, Plaintiff is permitted to plead these claims in the alternative as the proof required for each claim differs.  *See* Fed. R. Civ. P. 8(a)(3); *Mayor and Council of Rockaway v. Klockner & Klockner*, 811 F. Supp. 1039, 1053 (D.N.J. 1993)

Since a civil conspiracy claim is "essentially a tort action[,]" then "a plaintiff must also point to[:] (1) an overt act of one or more of the conspirators in furtherance of the conspiracy; and (2) consequential damage to the rights of another, of which the overt act is the proximate cause." *Id.* (citing *Board of Ed. Of the City of Asbury Park v. Hoek*, 66 N.J. Super. 231, 241 (App. Div. 1961), *rev'd in part on other grounds*, 38 N.J. 213 (1962)).   What makes a civil conspiracy actionable is "the tort which the defendants agreed to perpetuate and which they actually committed."  *Id.* (citing *Landriani v. Lake Mohawk Country Club*, 26 N.J. Super. 157, 159 (App. Div. 1953)).   Therefore, a civil conspiracy claim cannot survive without a viable underlying tort.

Moreover, a corporation cannot conspire with its employees or agents because they are considered a single entity.  *Id.* (citing *Heffernan v. Hunter*, 189 F.3d 405, 412 n.5 (3d Cir. 1999) (citation omitted).  Similarly, "individual agents, officers, or employees of a corporation, acting in their representative capacities cannot conspire among themselves."  *Id.* (citing *Marjac, LLC v. Trenk*, No. 06-cv-1440, 2006 WL 3751395, at *16 (D.N.J. Dec. 19, 2006)) (citations omitted); *see also IDT Corp. v. Unlimited Recharge, Inc.*, No. 11-cv-4992, 2012 WL 4050298, at *14 (D.N.J. Sept. 13, 2012) (emphasizing the intracorporate conspiracy doctrine "applies if an employee participates in the conspiracy in the course and scope of employment") (citation omitted). However, a conspiracy may be possible between agents, officers, or employees of a corporation where they were acting as individuals rather than on behalf of the corporation.  *See id.*

The Court previously found that the intracorporate conspiracy doctrine bars ISC's civil conspiracy claim as between Aliotta and REI and/or between Aliotta and the "Aliotta Entities," because they are considered a single entity under the doctrine.  *See* D.E. 41 at 27.  The TAC does not change this finding so the Court will find, for the same reasons as it did when addressing the FAC, that the TAC does not allege a civil conspiracy between Aliotta and REI.  Because the TAC

will be dismissed as to Aliotta Holdings for lack of personal jurisdiction, this ends the Court's analysis on Count VI.   Therefore, Count VI will be dismissed against Aliotta and REI with prejudice.

## IV.   CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss will be **GRANTED *in part* and DENIED *in part***.

- The TAC will be **DISMISSED *without prejudice*** as to Aliotta Holdings in its entirety for lack of personal jurisdiction.

- Count I – fraud in the inducement will be **DISMISSED *without prejudice*** as to Aliotta and REI.

- Count IV – breach of the duty of loyalty will be **DISMISSED *with prejudice*** as to REI.

- Count V – conversion will be **DISMISSED *without prejudice*** as to the funds at issue in Count I.

- Count VI – civil conspiracy will be **DISMISSD *with prejudice*** as to Aliotta and REI.

- Count II – fraud in the inducement and Count III – unjust enrichment remains as to Aliotta and REI

- Count IV – breach of the duty of loyalty remains as to Aliotta.

- Count V – conversion remains as to the funds at issue in Count II.

- ISC will have thirty (30) days to file a Fourth Amended Complaint consistent with this Opinion.   An appropriate Order accompanies this Opinion.


Dated: May 30, 2024

Evelyn Padin, U.S.D.J.